[PHILADELPHIA, JANUARY 25, 1830.]

## SAVOY and SALTER *against* JONES.

### IN ERROR.

A., *cestui que trust*, tenant for life, under a post nuptial marriage settlement, erected a building during her coverture, against which a person who furnished the bricks, filed a claim under the act of *March* 17th, 1806, "securing to mechanics and others, payment for their labour," &c. Upon this claim a *Scire Facias* was issued against A., and B., her husband, who was entitled to a contingent remainder for life under the settlement, and C., who, under the settlement, was trustee for A. and those in remainder and reversion. A., B., and C., appeared to the *Scire Facias*, and pleaded to issue; but before the trial, A. died, and B., her husband, became tenant for life under the settlement. *Held*, that notwithstanding B. became entitled in remainder upon the death of A., the lien, created upon the building by filing the claim, continued to bind against the remaindermen and reversioners, and was not confined in duration to the life interest of A., who erected the building.

The persons, or description of persons enumerated in the act of assembly of the 17th of *March*, 1806, "securing to mechanics and others, payment for their labour," &c. are not alone entitled to the remedies provided therein; but any person, without distinction, employed in furnishing materials for, or in erecting or constructing any house, or other building, is within the meaning of the act, and may file a claim, and thereby affect the house or building.

UPON a writ of error to the District Court for the city and county of *Philadelphia*, the case was this:—

A *Scire Facias* was issued against the defendants below, upon a claim filed in the office of the prothonotary of the District Court for the city and county of *Philadelphia*, on the 15th day of *November*, 1817, in these words:—"*Robert W. Jones*, of the city of *Philadelphia*, files this, his claim, for materials furnished, to wit: for bricks delivered by himself and servants at, and to be used in the construction of a certain three storied back building, adjoining and attached to, and immediately in the rear of a certain brick house, situate on the south side of *Pine* street, in the city aforesaid, between *Sixth* and *Seventh* streets from the *Delaware* river, num-

(Savoy and Salter *v.* Jones.)

bered 174, in the tenure, at the time the said bricks were delivered, of *Sarah Salter*, and adjoining ground then, or lately, of *John Gest* and ——— *M'Adams;* which said bricks were furnished and delivered since the passing of the act of the general assembly of the commonwealth of *Pennsylvania*, entitled, 'an act, securing to mechanics and others, payment for their labour and materials, in erecting any house or other building, within the city or county of *Philadelphia;*' passed the 17th day of *March*, 1806, and within six months preceding the date of filing this claim, to wit: in the months of *May* and *June*, in the year 1817, and on the furnishing and delivering and carting of which, there remains due and unpaid to the said *Robert W. Jones*, the sum of three hundred and ninety-three dollars and ninety-six cents, lawful money of *Pennsylvania*, with interest. Wherefore, to secure payment of the said sum of money, the said *Robert W. Jones*, agreeably to the provisions of the act of assembly aforesaid, files this, his claim, in the office of the prothonotary of the District Court of the city and county of *Philadelphia*, and declares the said sum to be a lien on the said building.

"*Robert W. Jones.*

"*Philadelphia, Nov.* 15th, 1827."

The writ of *Scire Facias* was issued against *Samuel Salter*, *Sarah Salter*, his wife, and *Francis Savoy*, trustee for *Sarah Salter*, *Samuel Salter*, and those in remainder and reversion; but *Sarah Salter* having died before the trial, which took place *March* 27th, 1827, her death was suggested by *Jones*, the plaintiff, and the issues joined between *Savoy*, *Samuel Salter*, and *Jones*, only were tried by the jury. The pleas to the *Scire Facias*, upon which the issues so tried were joined, were, *payment*, with leave to give the special matter in evidence, and *non assumpsit.*

The plaintiff, on the trial, read the claim filed, to the jury, to inform them of the subject matter in dispute between the parties; and then read in evidence a deed, dated *August* 29th, 1809, between *Samuel Salter* and *Sarah Salter*, of the one part, and *Francis Savoy*, of the other part, by which, (among other parcels of real estate,) "All that two story brick messuage or tenement, and lot or piece of ground, situate on the south side of *Pine* street, between *Sixth* and *Seventh* streets from *Delaware*, in the said city of *Philadelphia*, containing in front, or breadth, on the said *Pine* street, fifteen feet, and extending in length or depth, southward, one hundred feet; bounded on the north by the said *Pine* street, and on the east, partly by a three feet wide alley, extending southward from *Pine* street, thirty-six feet, and partly by ground of *Mary Rojeay*, on the south, by ground late of *White Matlack*, and on the west, by a two story brick house and lot of *Mary Rojeay*, subject to a rent charge of sixteen dollars;" (being the premises and lot mentioned in the said claim filed,) were conveyed to the said *Savoy*, "his heirs and assigns, for ever; but nevertheless, to and for the several

(Savoy and Salter *v.* Jones.)

uses, and upon the several trusts, &c:, declared of, and concerning the same; that is to say, to the use of the said *Sarah Salter*, and her assigns, for and during the term of her natural life, without impeachment of waste: And from and immediately after the determination of that estate, by forfeiture or otherwise, to the use of the said *Francis Savoy* and his heirs, during the life of the said *Sarah Salter*, in trust, to preserve the contingent uses, and other estates herein after limited, from being defeated or destroyed, and for that purpose, to make entries, or bring actions, as occasion shall require; but nevertheless, to permit and suffer the said *Sarah Salter* and her assigns, to receive and take the rents, issues, and profits thereof, to and for her own use, during her life; and from and after the decease of the said *Sarah Salter*, to the use of the said *Samuel Salter*, if he shall survive her, for and during the term of his natural life, without impeachment of waste: And from and immediately after the determination of that estate, by forfeiture or otherwise, to the use of the said *Francis Savoy* and his heirs, during the life of the said *Samuel Salter*, in trust, to preserve the contingent uses and estates, herein after limited, from being defeated or destroyed, and for that purpose, to make entries, and bring actions, as occasion shall require; but nevertheless, to permit and suffer the said *Samuel Salter*, his heirs and assigns to receive and take the rents, issues, and profits thereof, to and for his and their own use, during his life: And from and after the decease of the said *Samuel Salter*, to the use of his children, in fee, and in default of such children, to the use of *Sarah Salter*, her heirs and assigns, for ever." The said deed further recited, that the settlement contained in it, was made "only upon the condition of the said *Sarah Salter*, not recovering at any time hereafter any dower, or thirds, out of the real and personal estate of the said *Samuel Salter*." And it was further understood and agreed, between the said parties to it, "that the receipts of the said *Sarah Salter*, are to be good and effectual in law, and the rents, issues, and profits of the said messuages, or tenements, are not to be subject to the debts, control, or engagements of the said *Samuel Salter*." The plaintiff also read in evidence the deposition of *John Powell*, who said, "that he was by profession a bricklayer: That about nine years ago, he was employed by *Sarah Salter*, now deceased, (23d of *December*, 1826,) in the erection of a brick building of three stories, in the rear of house No. 174, on the south side of *Pine* street, between *Sixth* and *Seventh* streets from the *Delaware*. The bricks used in the building were sent by Mr. *Jones;* he was the man we used to send to, when we wanted bricks, and he came to us half a dozen or a dozen times at the building, to inquire what kind of bricks, and what quantity we wanted. Mrs. *Salter* employed me in this work, and paid me. She was the contracting party. I made my contract with her. He, (Mr. *Salter*,) however, was there towards the latter part of the time, and made the final payment on my bill. He has the receipt of witness

for the last or final payment. Mrs. *Salter* had paid him previously, from time to time along, as this deponent wanted money. The deponent thinks the quantity of bricks received from *Jones,* at that building, was forty thousand, perhaps more. Mrs. *Salter* told me she got these bricks from Mr. *Jones.* The bricks were higher in price at that time, than at present; they were, a few years before this building, as high as ten dollars a thousand. I do not recollect exactly the price in 1817. Rather higher in the spring than at other seasons. This building was put up some time after *April.* Mr. *Salter* lived in the *Pine* street house all the time we were doing the work. The man who hauled the bricks was a witness before the arbitrators. The work, the brick work, was measured after it was put up, to ascertain the quantity. Mrs. *Salter* frequently said she had to pay Mr. *Jones* for these bricks."

Being cross-examined by the defendant's counsel, the witness said:—"This house stands right back of the main building, but does not join it; twelve or fourteen feet between them; may be twelve or fourteen feet, may be more. Consists of two buildings, with distinct chimneys between the two; three stories high; two separate entrances, or doors. I cannot say how long we had been at work when *Salter* appeared. I do not recollect whether it was said, that he was up town, or in the western country all the time; nor whether it was then, or afterwards, Mr. *Salter* said he was in the western country. I worked for her afterwards. These bricks came, they said, from near *Schuylkill.* I know *Jones* said they came from some where out by *Schuylkill.* I do not know that *Jones* was a brickmaker. I do not recollect *Jones* saying any thing in relation to *Peter Bob.* I think *Salter* gave me a note for the balance due on the building, which note was paid. All the erection was under one roof. I think there was no partition wall between them; there was no fence between the building and the house on *Pine* street. The house was topped out all but the chimneys, when Mr. *Salter* first appeared. I believe Mrs. *Salter* paid me money every week. I worked for Mrs. *Salter* afterwards, viz. at the corner of *Library* and *Fourth* streets, and corner of *Fifth* and *Walnut* streets, and at other times; she paid me on these occasions—made the contracts with me. He never paid me only the balance, as I before stated. The chimney was between the divisions. If there was any partition wall, it is likely we run up scaffold high, and then built the scaffold on it. No parapet on the roof—a single pitched roof." And having given the aforesaid evidence, the counsel for the said *Jones* rested his case.

The counsel for the defendants below then gave in evidence a general assignment, dated the 22d of *October,* 1816, made by *Peter Bob,* of the city of *Philadelphia,* brickmaker, of all his estate, real and personal, to the said *Robert W. Jones, Samuel Salter,* and *Daniel Shuttle,* reciting, that *Shuttle* and *Jones* were bound in a replevin bond to the sheriff of the city and county of *Philadelphia,*

(Savoy and Salter *v.* Jones.)

into which they had entered at the instance of *Peter Bob,* against whom, in the action in which the bond was taken, judgment had been obtained for four hundred and seventy-five dollars: That *Bob* was indebted to *Salter* in one hundred and seventy-five dollars; and also, to five of his working men in the sum of two hundred and fifty-five dollars; and, that he had agreed to transfer all his said estate for the benefit of all his creditors, after the demands aforesaid, amounting to nine hundred and fifty dollars, were paid; and conveying all his estate to·be applied, first for that purpose, and also, to pay the further sum of three hundred and sixty-eight dollars, shortly to become due, to *Hanson Waters,* for the rent of a brick-yard, then occupied by *Bob;* and after satisfying the assignees, labourers, and *Hanson Waters,* to divide the remainder of the trust fund equally among all such of the creditors of *Bob* as should sign those presents.

The defendant's counsel then offered *Samuel C. Elfrey,* a witness, who testified as follows:—" I hauled them bricks from *South* street and *Front* street from *Schuylkill* to the building.  I saw there a Mrs. *Salter.*  I delivered them to Mrs. *Salter.*  I hauled them with three carts.  There was not more than forty thousand two hundred bricks, or thereabouts.  *Jones* paid me for the hauling.  I never hauled bricks for *Jones* to any other building or place.  I cannot say I saw any other person there than Mrs. *Salter.*"

Being cross-examined, he said:—" I did know him, *Peter Bob,* right well.  These bricks were hauled from a yard there, not exactly in the kiln.  *Bob* and two young men helped to count them, and helped to load them.  I do not know what *Jones* was.  He said, he, *Peter Bob,* owed him money; he went security, and took these bricks and sold them.  I did not hear any thing about rent and a landlord."

And also, *John Hinchilwood,* who testified as follows:—" Mr. *Jones* and *Samuel Salter* called on me one morning.  I rented a lot of *Salter;* they wanted to lay a kiln of bricks on part of my garden.  I gave liberty to do it if they would take them away; for this I received five dollars from *Jones,* and five dollars was deducted from the rent when I paid *Salter.*  The bricks came, and some time after,*Jones* came with four carts, on purpose to take the bricks.  I went to look for *Salter,* who was in the country, and got *Salter.*  I saw them together, and then the bricks were taken away.  I understood *Jones* took them away; he was present waiting on the carts; he said he was taking them to Mrs. *Salter.*  I could not say there was a kiln; but there was a very large quantity.  This was ten years ago, or thereabouts.  I saw him there once at least, and considered him to be *Peter Bob,* along with *Jones.*  I had some conversation with *Bob* and *Jones.*  They were ill-pleased with me, because I had no business to stop them; which I did, because *Salter* told me so to do.  They did not say *Salter* had nothing to do with the bricks.  I

cannot tell who carried them away after that. *Jones* was a fringe-weaver. He was an *Englishman.*" Upon his cross-examination, he said:—" The lot was corner of *Eighth* street from *Schuylkill* and *Walnut* street. I do not know where *Peter Bob's* brick-yard was."

The defendants further produced *Samuel M. Solomons* and *Charles Culnan,* to show, that the building did not correspond with the description of it in the claim filed; but their testimony is here nowise material.

The counsel for the defendants then requested the court to charge the jury,

" 1. That a lien binds not a building beyond the duration of a life interest in the land, upon which any building is erected, under a contract with the tenant for life; and that the interest of a remainderman, whether for life or in fee, will not be affected by any proceeding under it, after the interest of the tenant for life is determined.

" 2. That no persons, or description of persons, can file a lien, other than those enumerated in the act of assembly of the 17th of *March,* 1806; and that unless they, the jury, believe, from the evidence in the cause, that *Jones,* the plaintiff, was a brickmaker, he could not file a lien."

But the court refused so to charge, and charged the jury as follows:—

*Barnes, Judge.*—" There are questions of law, which at first I intended to dispose of; but the facts have been strongly pressed by the defendants' counsel, and if the case is with them on the facts, recourse to matters of law is unnecessary. I have determined, therefore, to put the case to you on the facts. This is a *Scire Facias.* [Here he stated the nature of the action, and the parties.] A point of law is made, that *Sarah Salter* being dead, the lien is gone. For the purposes of this discussion, I shall say the law is not so; though there may be something in it, because the reversioner is not, perhaps, to be affected; but I tell you for the present, the law is not so—the lien continued. Now for the facts. That the plaintiff delivered these bricks to the carter, is most certain: That they have not been paid for by *Sarah Salter,* is most evident. It is said, that the plaintiff is not entitled to recover, because the property is joint property, and if so, the plaintiff cannot recover. If *Jones* sold these bricks, and they were sold in that character of trustee, the funds belong to the creditors of *Bob,* and *Jones* cannot divert the fund from its legitimate course to himself. The assignment was made on the 22d of *October,* 1816, to *Jones, Salter,* and *Shuttle,* and if the trustees accepted the trust, the plaintiff cannot recover; but if the co-assignees agreed, that *Jones* should take them in his separate character, then he might file a lien, and might recover; but there ought to be few presumptions in such a matter. These bricks were taken

(Savoy and Salter *v*. Jones.)

from a yard near *South* street. *Jones* said these bricks were given to him by *Bob*, for a debt he owed him. In case you believe this property passed to the trustees under the assignment, he cannot recover; but he may, if the property did not pass, &c., and he may, if you believe he took out of the fund these bricks, with the consent of his co-trustees, for his own use, and as his separate property. Upon the other point, I say, that a person who is not a brickmaker, may file a lien under our lien laws."

Upon this charge, to which the defendants excepted, the jury found a verdict for the plaintiff.

The plaintiffs in error assigned the general errors, and the following specific errors:—

"1. That the COURT below refused to charge the jury, that a lien binds not a building beyond the duration of a life interest in the land, upon which the building is erected, under a contract with the tenant for life, and that the interest of a remainderman, whether for life or in fee, will not be affected by any proceeding under it, after the interest of the tenant for life is determined.

"2. That the COURT below refused to charge the jury, that no persons, or description of persons, can file a lien, other than those enumerated in the act of assembly of the 17th of *March*, 1806, and that unless they, the jury, believe, from the evidence in the cause, that *Jones*, the plaintiff below, was a brickmaker, he could not file a lien."

*Ingraham*, for the plaintiffs in error.—The act of assembly of *March*, 1806, *Purd. Dig.* 545, is a very loosely worded law, but no construction of it has been called for, going so far as that contended for in this instance. It certainly did not contemplate, nor does it profess to do so, making any alterations in the rights of persons to their own property, independent of any interference by contract on their part. A mere trespasser, a guardian, or other fiduciary, could not affect the title of an infant, a *feme covert*, or a *lunatic*, by a breach of trust; and the argument for the plaintiff must go *that* length, if it be worth any thing.

The reversioner cannot prevent the tenant of the particular estate from building a house during the continuance of his interest; and to subject the reversion to a lien creditor's sale, is making the reversioner virtually pay the debt. Suppose a lot let upon ground rent, with the usual clause of re-entry by the ground landlord, and the usual covenant by the grantee, that he will build a house to secure the payment of the ground rent, and a re-entry made by the landlord for non-payment of ground rent, could a lien creditor sell his estate for a lien said to be created on the building by the grantee, whose estate is gone by the re-entry? Such a decision would strike at the root of all property.

The construction, however, of this act, has been settled by decision. The case of *Kline* v. *Lewis*, (*Ing. on Insolvency*, 242.) *Lyle* v. *Ducomb*, 5 *Binn.* 585, in principle, decide this case. There,

(Savoy and Salter *v.* Jones.)

*Lyle* sold under his bond, and took the proceeds of the mortgaged premises in preference to the lien creditors; but he certainly might have recovered the land from *Ducomb*, by ejectment upon his mortgage, and no lien creditor could have disturbed his title to the pledged land so acquired, any more than he could the proceeds of the sale.

As to the other point. This act was passed for the benefit of mechanics and persons who furnished materials for houses, or labour. The *words* of the act are not broader than the spirit. There is an enumeration of those by trades and callings, who are intended to be protected, and the protection is extended, by the next paragraph, not generally to every one, but to others *employed* in furnishing materials, &c.; that is, other persons, whose *business it is to furnish*, &c., not the world at large.

Upon what other principle is the well-established doctrine, that *journeymen* cannot file a claim to be sustained; the *words* cover *them;* yet, the question has been tried and acquiesced in. *Cobb* v. *Traquair, Dist. Ct. Dec.* 1819, 859. *Frank. Inst. Jour. Vol. I.* p. 97. So of *paper-hangers, stainers,* and *plumbers.* Surely a paper-hanger, who completes the wall, is as much *employed* in the *construction* of a house, as the *plaisterer,* who puts a single coat of plaister on it.

The act of the 24th of *March,* 1818, *Purd. Dig.* 547, in relation to *curb-stone,* decides the intention of the legislature. There was a a decision against the claim, (*Leiper* v. *Smith, Frank. Inst. Jour.* 96,) and the act was passed to remedy it, by giving a lien, though the curb-stone is as much part of a *city house,* as a copper kettle is of a brew-house. *Gray* v. *Holdship,* 17 *Serg. & Rawle,* 413.

The words are, to " any person furnishing," &c.; and yet, the act of the 23d of *April,* 1829. (*Pamph. Laws,* 301,) gave a lien expressly to the City, for *curbing* and furnishing *curb-stone;* though the words of the act of *March* 24th, 1818, are certainly wide enough to include them.

*Scott, contra.*

The opinion of the court was delivered by

Gibson, C. J.—The object of the legislature was to enable the mechanic or materialman, to follow his labour or materials into the building, which is pledged for the price without regard to the estate of the owner. Did the lien proceed from a contract with the owner, the argument drawn from the apparent injustice of permitting a tenant for life to affect the estate of the remainderman, who was not a party, would not be destitute of plausibility. But there is no real injustice in the matter, the owners of the several parts of the fee, being proportionately benefitted; and it is consequently just, that the whole should bear the burden. But there are many cases in the law, in which an estate in remainder, is subject to the acts of the particular tenant. The lien, however, arises from the

(Savoy and Salter *v.* Jones.)

credit having been given, not to the owner, but the building; and in a decisive majority of cases, the labour or material, is furnished to master builders, who have no interest in the ground: so that the construction contended for, would frustrate the object of the legislature nearly altogether. The remaining point is attended with still less difficulty. A lien is given in general and comprehensive terms, to every one without distinction, "employed in furnishing materials for, or in the erecting, or constructing," of any house or other building; and I cannot imagine why none but regular dealers in the article, or workmen bred to the particular craft should have the benefit of it. We have mechanics who can turn their hand to any thing; and there is the same reason for hypothecating the product of a bricklayer's labour, for wages earned as a carpenter, as there would be for wages earned in his proper vocation; and a dealer *pro hac vice*, would seem to be as much within the reason of the law, as if he had no other business. The law may not, on the whole, be a beneficial one, even to the peculiar objects of its protection; still, it is entitled to a reasonable construction, and we cannot doubt, that the plaintiff is entitled to the benefit of it.

Judgment affirmed.